## IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
## IN AND FOR PINELLAS COUNTY, STATE OF FLORIDA
## CIVIL DIVISION

**Deborah Waldemar,** individually and as owner
of her IRA**,**

|  |  |
|---|---|
| **Plaintiff**, | Case No. _____ |

v.

**Shaun P. Golden,** individually, and
**Golden Wealth Management, Inc.**, a
New York corporation,

                            **Defendants**.

_____/

## COMPLAINT
## AND DEMAND FOR JURY TRIAL

The Plaintiff, Deborah Waldemar, individually and as owner of her IRA, through their

undersigned counsel, hereby sue the Defendant, Shaun P. Golden and Golden , and states, as follows:

### JURISDICTION AND VENUE

1.      This is an action for damages that exceed $15,000.00.

2.      At all times relevant to matters alleged in this Complaint, Plaintiff Deborah

Waldemar, a recent widow in her early 70's, was a resident of Pinellas County, FL.

3.      Plaintiff Deborah Waldemar consents to the jurisdiction of this court and to Pinellas

County as the appropriate venue for bringing this action.

4.      At all times relevant to matters alleged in this Complaint, upon information and

belief, Defendant Shaun P. Golden (**"Golden"**) was a resident of New York, and his company,

Defendant Golden Wealth Management, Inc. (**"Golden Wealth"**), maintained its principal place of

business in New York.

5.      At all times material to matters alleged in this Complaint, Golden and Golden Wealth

conducted investment advisory business activities in the State of Florida. They were also registered as investment advisors with the State of Florida, Office of Financial Regulation.

6.      In connection with their registration with the State of Florida as investment advisors, both Defendants irrevocably consented to service of process on the State of Florida for actions against them arising from their investment advisory activities in the Florida. §§ 517.12(6), 517.101, Fla. Stats (2017). As part of that irrevocable consent, the Defendants also consented to the county of the plaintiff's residence as proper venue. § 517.101(2), Fla. Stats.

## THE PARTIES

7.      **Plaintiff Deborah Waldemar**, is seventy two (72) years of age. On January 13, 2015, she unexpectedly lost her husband of fifty (50) years, George Waldemar. Together, they had owned and operated a small printing business in New York which they gave to their son in 2007. They then moved to Pinellas County, Florida.

8.      Years ago, Golden sold George Waldemar a life insurance policy. Within ten days following Mr. Waldemar's passing, Golden met with Deborah Waldemar to offer his services in handling the insurance proceeds in the amount of approximately $426,000.

9.      In his capacity as investment advisor, Golden gained control of the insurance proceeds received by Mrs. Waldemar in the amount of approximately $426,000 plus Mrs. Waldemar's small IRA account.

10.     **Golden and Golden Wealth** are investment advisors registered as such in New York and, until February of 2017, in Florida.

11.     Prior to December of 2011, Golden was also registered with the State of Florida, Office of Financial Regulation, as a registered representative with a brokerage firm (commonly

2

referred to as a securities broker or financial advisor). In December of 2011, the Financial Industry Regulatory Authority (**"FINRA"**) sanctioned Golden by permanently barring him from any association, in any capacity, with any FINRA-member brokerage firm (**"FINRA Bar"**).

12.     On February 8, 2017, the State of Florida, Office of Financial Regulation, issued a Final Cease & Desist Order (**"Final Order"**) against Defendants Golden and Golden Wealth from further violations of Chapter 517, Florida Statutes (Florida Securities and Investor Protection Act) (**"Florida Securities Act"**). Both Golden and Golden Wealth were barred permanently from submitting any application for licensure or registration under the Florida Securities Act, in effect banning both Golden and Golden Wealth from furthermore acting as a securities broker, registered representative, or investment advisor in the State of Florida. The Final Order is attached as **Exhibit "A."**

**GENERAL ALLEGATIONS**

13.     In 2015, Golden presented Plaintiff with documents and agreements for her signature, including the following agreements:

- Golden Wealth Financial & Estate Planning Agreement dated January 22, 2015 (**"Financial Planning Agreement"**), between Golden Wealth and Deborah Waldemar attached as **Exhibit "B."**

- Investment Management Agreement dated January 22, 2015, between Golden Wealth and Deborah Waldemar attached as **Exhibit "C."**

14.     Golden presented these agreements to Mrs. Waldemar within ten (10) days of her husband's passing with "sign here" tabs. He did not discuss these agreements with Mrs. Waldemar. Nor did he explain their importance to her.

15.     In the Financial Planning Agreement, Golden Wealth, through Golden, represented

3

that the Agreement covered "services and fees provided by the Advisor for financial planning, estate planning and any time spent on your requested matters . . . ." The agreed-upon fees were "$395.00 per hour plus disbursements for any time spent on your matter."

16.     In the Investment Management Agreement for Deborah Waldemar, Golden Wealth, through Golden, agreed to provide investment advice and management with discretionary control over amounts invested for yet additional fees.

17.     Pursuant to the foregoing Agreement, Golden Wealth was to be paid a Management Fee of 2% per year, calculated on the Net Asset Value. And, Golden Wealth was to be paid an additional 20% of increases in the Net Asset Value per month, with certain adjustments for any prior losses.

18.     The initial amount of Plaintiff Deborah Waldemar's funds subject to her Investment Management Agreement with Golden and Golden Wealth was $426,319, the proceeds of the life insurance policy on the life of her late husband. That amount plus some interest on that amount was deposited in March of 2015 in an account at Interactive Brokers, LLC for Deborah Waldemar opened for her by Golden.

19.     At around the same time, i.e., March of 2015, Golden gained control of an additional $79,266.34, representing Deborah Waldemar's IRA account and deposited it in another Interactive Brokers' account set up for her by him.[1]

20.     In her conversations with Golden, both prior to and after the execution of the Investment Management Agreement, Plaintiff Deborah Waldemar told Golden that she only wanted

_____

[1]     The Interactive Brokers' account opening documents were prepared by Golden and presented to Deborah Waldemar with "sign here" tabs for her signature on January 22, 2015, just days after the death of her husband.

4

her funds held in the Interactive Brokers' accounts and not traded for the time being.

21.     In addition, Plaintiff Deborah Waldemar told him that she knew that her income would be dropping significantly and that there was a $192,000 equity line of credit that would come due in January of 2016. She did not want to invest the funds until the equity line was paid off and she got her bearings. These facts were explicitly communicated to Golden.

22.     The roughly $500,000 from Plaintiff Deborah Waldemar under Golden's control represented a substantial portion of her liquid net worth.

23.     Contrary to Plaintiff Deborah Waldemar's explicit instructions to simply hold her funds in an account, Golden Wealth, through the actions of Golden, began trading her Interactive Brokers' accounts soon after their opening.

24.     Because Golden had engendered her trust, Plaintiff Deborah Waldemar expected that he was following her instructions to simply hold her funds in the Interactive Brokers' accounts until after she had taken care of the home equity line of credit at the end of the year and recovered somewhat from the sudden loss of her husband. Based on that expectation, she did not ask for or review periodic account statements.

25.     In October of 2015, Golden and Plaintiff Deborah Waldemar met to review her financial situation. This meeting was in response to a request from the Plaintiff Deborah Waldemar. At that meeting, he showed her a statement reflecting a loss of almost ($200,000) from her Interactive Brokers' account that had been funded with her late husband's life insurance policy proceeds.

26.     Stunned, Plaintiff Deborah Waldemar would later learn that the loss was the result of excessively trading that account, despite her explicit instructions that no buying or selling of stocks

occur during this period.  In short, in less than 8 months, Golden had traded away almost 50% of her Interactive Brokers' account funded with her late husband's life insurance policy proceeds, exclusive of margin interest, advisor fees, and commissions was $193,914.

27.    Despite having "traded away" substantial amounts of the principal values of her accounts at Interactive Brokers, Golden had also been paid advisory fees out of her accounts.

28.    Plaintiff was stunned to learn that, despite having "traded away" substantial amounts of the principal values of her accounts, Golden had charged grossly unreasonable investment advisory fees in the amount of approximately $55,000 over the short period of time he had control of her accounts.

29.    Pursuant to Section 2 of the Investment Management Agreement with the Plaintiff Deborah Waldemar, Defendant Golden Wealth, through Golden, acknowledged and agreed that it was acting as a fiduciary with respect to the Plaintiff's funds.

30.    In addition, investment advisors are fiduciaries under applicable law. *See, e.g.* § 518.10, Fla. Stat. (defining "fiduciary" to include those who, pursuant to written agreement, have responsibility for managing or investing other peoples' money). The fiduciary duties of investment advisors, as articulated by the Securities and Exchange Commission, include, in part, the following:

> As an investment adviser, you are a "fiduciary" to your advisory clients. This means that you have a fundamental obligation to act in the best interests of your clients and to provide investment advice in your clients' best interests. You owe your clients a duty of undivided loyalty and utmost good faith. You should not engage in any activity in conflict with the interest of any client, and you should take steps reasonably necessary to fulfill your obligations. You must employ reasonable care to avoid misleading clients and you must provide full and fair disclosure of all material facts to your clients and prospective clients. Generally, facts are "material" if a reasonable investor would consider them to be important. You must eliminate, or at least disclose, all conflicts of interest that might incline you — consciously or unconsciously — to render advice that is not disinterested. . . . Departure from

6

this fiduciary standard may constitute "fraud" upon your clients (under Section 206 of the Advisers Act).

Available at http://www.sec.gov/divisions/investment/advoverview.htm

31.    Also, under the Florida Securities Act, investment advisors are prohibited from engaging in certain conduct, including misrepresentations and omissions in connection with the rendering of investment advice.  § 517.301, Fla. Stats. (2017).

32.    Other prohibited conduct under regulations promulgated under the Florida Securities Act include (i) the recommendation of unsuitable investments, (ii) the excessive trading of a customer's account in view of the customer's financial resources, investment objectives, and character of the account, (iii) misrepresenting the qualifications of the investment advisor, (iv) charging a customer an unreasonable advisory fee, (v) charging a customer an advisory fee in excess of that authorized by the written advisory services agreement, and (vi) failing to send a customer an itemized invoice each time a fee is directly deducted from the customer's account. Fla. Admin. Code Rules 69W-600.0131, 69W-600.0132(2)(i) (2017).

33.    In presenting the Financial Planning Agreement and the Investment Management Agreement to the Plaintiff, Golden and Golden Wealth failed to disclose that Golden had been the subject of disciplinary proceedings initiated by FINRA in 2011 and that those proceedings had resulted in the FINRA Bar.

34.    At no time after the execution of the foregoing Agreements by the Plaintiff did Golden personally inform the Plaintiff of the FINRA Bar.  Had the Plaintiff known of the FINRA Bar, she would not have entered into the foregoing Agreements with Golden Wealth.  Nor, would the Plaintiff have entrusted Golden and Golden Wealth with substantially all of her liquid net worth had

she known of the FINRA Bar.

35.    Golden and Golden Wealth (i) excessively traded the Plaintiff's Interactive Brokers' accounts, (ii) charged her unreasonable advisory fees, (iii) charged fees in excess of the amounts authorized by the Investment Management Agreement, (iv) made investment decisions that were unsuitable for the Plaintiff based on her financial resources, investment objectives, and character of her accounts, (v) misrepresented, by omission of the FINRA Bar, the qualifications of Golden, and (vi) failed to send the Plaintiff an itemized invoice each time advisory fees were deducted from her Interactive Brokers' accounts for payment of advisory fees to Golden and Golden Wealth.

36.    In light of the foregoing wrongful actions of Golden and Golden Wealth, their conduct fell below the standard of care applicable to investment advisors and was the direct and proximate result of the losses incurred by the Plaintiff.

37.    There are no conditions remaining to be fulfilled prior to the Plaintiff bringing this action.

## COUNT I

### FRAUDULENT INDUCEMENT AND COMMON LAW FRAUD

38.    Plaintiff realleges and incorporates by reference as if set forth verbatim in this paragraph, paragraphs (1) through (37).

39.    Defendants Golden and Golden Wealth made representations in the Investment Management Agreement regarding Golden and Golden Wealth's qualification, including a representation of no pending proceedings or regulatory actions. Defendants also represented that they would act consistent with the Plaintiff's instructions and investment objectives with respect to her Interactive Brokers' accounts.

40. The foregoing representations concerning the Defendants' qualifications were false in light of the Defendants failure to disclose a material fact, the existence of the FINRA Bar. The foregoing representations concerning the Defendants' intent to honor the Plaintiff's instructions and investment objectives were false in light of the Defendants' subsequent trading in the Plaintiff's accounts at Interactive Brokers.

41. Defendants Golden and Golden Wealth knew or should have known that their representations were false in light of the omitted information.

42. The Defendants intended that the false statements induce the Plaintiff's reliance, and the Plaintiff reasonably relied on the Defendants' misrepresentations, incurring damages as a result of her reasonable reliance.

**WHEREFORE**, the Plaintiff demands judgment for damages against the Defendants Golden and Golden Wealth, jointly and severally, for the resulting damages in the amount of $193,914.00, plus disgorgement of advisory fees in the amount of $55,655.00, the cost of this litigation, interest as permitted by Florida law, and such other relief that this Court deems right and just.

## COUNT II

### BREACH OF FIDUCIARY DUTY

43. Plaintiff realleges and incorporates by reference as if set forth verbatim in this paragraph, paragraphs (1) through (37).

44. The Defendants owed the Plaintiff the duties of a fiduciary, including the duty to act in her best interests, the duty of good faith, the duty not to mislead or misrepresent, and the duty of full and fair disclosure of all material facts.

45. The Defendants breached the foregoing duties owed the Plaintiff by failing to act in

9

the Plaintiff's best interest, by failing to act with good faith, by misleading and misrepresenting their intent in taking control of the Plaintiff's savings, and in failing to provide full and fair disclosure regarding the excessive trading of her accounts, the excessively unreasonable advisory fees, and the existence of the FINRA Bar, among other material non-disclosures.

46.     The Plaintiff suffered damages as a direct and proximate result of the Defendants' breaches of fiduciary duties owed the Plaintiff.

**WHEREFORE**, the Plaintiff demands judgment for damages against the Defendants Golden and Golden Wealth, jointly and severally, for the resulting damages in the amount of $193,914.00, plus disgorgement of advisory fees in the amount of $55,655.00, the cost of this litigation, interest as permitted by Florida law, and such other relief that this Court deems right and just.

## COUNT III

## NEGLIGENCE

47.     Plaintiff realleges and incorporates by reference as if set forth verbatim in this paragraph, paragraphs (1) through (37).

48.     The Defendants owed Plaintiff a duty of care in providing investment advisory services to the Plaintiff.

49.     The Defendants' conduct in providing investment advisory services to the Plaintiff fell below the applicable standard of care for investment advisors.

50.     The losses suffered by the Plaintiff were a direct and proximate result of the Defendants' breach of their duty of care.

**WHEREFORE**, the Plaintiff demands judgment for damages against the Defendants Golden and Golden Wealth, jointly and severally, for the resulting damages in the amount of $193,914.00,

plus disgorgement of advisory fees in the amount of $55,655.00, the cost of this litigation, interest as permitted by Florida law, and such other relief that this Court deems right and just.

## COUNT IV

### BREACH OF CONTRACT

51.    Plaintiff realleges and incorporates by reference as if set forth verbatim in this paragraph, paragraphs (1) through (37).

52.    Pursuant to the agreements between the Plaintiff and the Defendants, the Defendants were obligated to act in the Plaintiff's best interests, to act in a manner consistent with the Plaintiff's investment objectives and directions with respect to her accounts, and to act in good faith in compliance with applicable laws, regulations, and FINRA Rules.

53.    The Defendants breached their obligations under the agreements with the Plaintiff, and the Plaintiff suffered damages as a result of the Defendants' breaches of the agreements.

**WHEREFORE**, the Plaintiff demands judgment for damages against the Defendants Golden and Golden Wealth, jointly and severally, for the resulting damages in the amount of $193,914.00, plus disgorgement of advisory fees in the amount of $55,655.00, the cost of this litigation, interest as permitted by Florida law, and such other relief that this Court deems right and just.

## COUNT V

### VIOLATION OF FLORIDA SECURITIES ACT

54.    Plaintiff realleges and incorporates by reference as if set forth verbatim in this paragraph, paragraphs (1) through (37).

55.    In connection with the rendering of investment advice and in the purchase and sale of securities with respect to the Plaintiff, the Defendants made misrepresentations and omissions of

11

material facts.

56.    The Defendants gained control of the Plaintiff's savings through misrepresentations and omissions of material fact, excessively traded the Plaintiff's accounts, and acted inconsistent with her investment objectives.

57.    The foregoing conduct of the Defendants violated Section 571.301, Florida Statutes, for which the Defendants are jointly and severally liable pursuant to Section 517.211

**WHEREFORE**, the Plaintiff demands judgment for damages against the Defendants Golden and Golden Wealth, jointly and severally, for the resulting damages in the amount of $193,914.00, plus disgorgement of advisory fees in the amount of $55,655.00, attorney's fees, the cost of this litigation, interest as permitted by Florida law, and such other relief that this Court deems right and just.

**DATED**: September 6th, 2017                Respectfully Submitted,

                                              **COLEMAN LAW FIRM**


                                              /s/Jeffrey P. Coleman

                                              Jeffrey P. Coleman Esq.
                                              Florida Bar No. 503614
                                              581 South Duncan Avenue
                                              Clearwater, FL 33756
                                              Primary: jeff@colemanlaw.com
                                              Secondary: emily@colemanlaw.com;
                                              livia@colemanlaw.com
                                              Phone: 727-461-7474
                                              Fax: 727-461-7476

12

IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
IN AND FOR PINELLAS COUNTY, STATE OF FLORIDA
CIVIL DIVISION

**Deborah Waldemar,** individually and as owner
of her IRA,

                               **Plaintiff**,                  Case No. _____

v.

**Shaun P. Golden,** individually, and
**Golden Wealth Management, Inc**., a
New York corporation,

                               **Defendants**.

_____/

# LIST OF EXHIBITS

**A**       Final Order of the State of Ohio, Office of Financial Regulation

**B**       Financial & Estate Planning Agreement dated January 22, 2015, between Golden Wealth Management, Inc. and Deborah Waldemar

**C**       Investment Management Agreement dated January 22, 2015, between Golden Wealth Management, Inc. and Deborah Waldemar

Filing # 61378462 E-Filed 09/06/2017 01:16:08 PM

IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
IN AND FOR PINELLAS COUNTY, STATE OF FLORIDA
CIVIL DIVISION

**Deborah Waldemar,** individually and as owner
of her IRA**,**

                                **Plaintiff,**                   Case No. _____

v.

**Shaun P. Golden,** individually, and
**Golden Wealth Management, Inc.,** a
New York corporation,

                                **Defendants**.

_____/

**EXHIBIT "A" to Complaint**

OFR 2017-55

## STATE OF FLORIDA
## OFFICE OF FINANCIAL REGULATION

IN RE:

SHAUN PAUL GOLDEN, CRD# 2629946,     **Administrative Proceeding**
                                      **No: 68851-S**
GOLDEN WEALTH MANAGEMENT,
INC., CRD# 157893,

          **Respondents.**



## FINAL ORDER

    The State of Florida, Office of Financial Regulation (the "Office"), being authorized and directed to administer and enforce Chapter 517, Florida Statutes, hereby enters this Final Order with Notice of Rights ("Final Order") as authorized by the provisions of Chapters 120 and 517, Florida Statutes, against Shaun Paul Golden ("Golden"), CRD# 2629946, and Golden Wealth Management, Inc. ("GWM"), CRD# 157893 (collectively the "Respondents").

## FINDINGS OF FACT

    1.   On or about November 10, 2016, the Office issued an Administrative Complaint and Notice of Rights ("Administrative Complaint") against Respondents and alleged violations of Chapter 517. The Administrative Complaint informed Respondents that the Office intended to enter a Final Order imposing penalties authorized by Chapter 517, Florida Statutes. A true and correct copy of the Administrative Complaint is attached. (See Exhibit "A")

    2.   The Administrative Complaint had attached thereto a Notice of Rights, which fully advised Respondents that they had twenty-one (21) days after receipt of service within which to petition the Office for an administrative hearing to contest the allegation set forth in the Administrative Complaint and that failure to do so would constitute a waiver of such right.

    3.   On or about November 17, 2016, the Administrative Complaint was served by Certified Mail on Respondents at GWM's address of record with the Office. The tracking results

Shaun Paul Golden
Golden Wealth Management
Page 2 of 5

for the Administrative Complaint from the United States Postal Service's website indicate that

the Administrative Complaint was delivered on November 17, 2016.  (See Exhibit "B")

4.   As of the date of this Final Order, Respondents have failed to file a petition for

hearing or to file any other document with the Office in response to the Administrative

Complaint.

5.   The facts alleged as the basis for the Administrative Complaint, being uncontested,

are incorporated herein by reference and are adopted as findings of fact for purposes of this Final

Order.

## CONCLUSIONS OF LAW

6.   The Office is responsible for the administration and enforcement of Chapter 517,

Florida Statutes, and has jurisdiction over the subject matter and Respondents pursuant to

Chapter 517, Florida Statutes.

7.   Rule 28-106.101, Florida Administrative Code, provides this chapter shall apply

in all proceedings in which the substantial interests of a party are determined by the agency and

shall be construed to secure the just, speedy, and inexpensive determination of every proceeding.

This chapter applies to all proceedings under Chapter 120, Florida Statutes, except for three

exceptions.

8.   This proceeding does not qualify for one of the exceptions listed in Rule 28-

106.101, Florida Administrative Code.

9.   Rule 28-106.2015(1), Florida Administrative Code, provides that prior to entry of

a final order to suspend, revoke, or withdraw a license, to impose administrative fines, or to take

other enforcement or disciplinary action against a licensee or person or entity subject to the

agency's jurisdiction, the agency shall serve upon the licensee an administrative complaint. For

purposes of this rule, an agency pleading or communication that seeks to exercise an agency's

Shaun Paul Golden
Golden Wealth Management
Page 3 of 5

enforcement authority and to take any kind of disciplinary action against a licensee or other person shall be deemed an administrative complaint.

10.    Rule 28-106.2015(3), Florida Administrative Code, provides that the agency's administrative complaint shall be considered the petition, and service of the administrative complaint on the respondent shall be deemed the initiation of proceedings.

11.    Rule 28-106.110, Florida Administrative Code, provides that unless the presiding officer otherwise orders, every pleading and every other paper filed in a proceeding, except applications for witness subpoenas, shall be served on each party or the party's representative at the last address of record.

> Subsection 120.60(5), Florida Statutes sets forth the following service requirements: No revocation, suspension, annulment, or withdrawal of any license is lawful unless, prior to the entry of a final order, the agency has served, by personal service or certified mail, an administrative complaint which affords reasonable notice to the licensee of facts or conduct which warrant the intended action and unless the licensee has been given an adequate opportunity to request a proceeding pursuant to ss. 120.569 and 120.57. When personal service cannot be made and the certified mail notice is returned undelivered, the agency shall cause a short, plain notice to the licensee to be published once each week for 4 consecutive weeks in a newspaper published in the county of the licensee's last known address as it appears on the records of the agency. If no newspaper is published in that county, the notice may be published in a newspaper of general circulation in that county.

12.    The Office's issuance of the Administrative Complaint as set forth in paragraphs one (1) through three (3) above complies with the service requirements provided in Subsection 120.60(5), Florida Statutes.

13.    Respondents failure to file a petition for hearing or to file any other document in compliance with Rules 28-106.201 or 28-106.301, Florida Administrative Code, constitutes a waiver of Respondents right to an administrative hearing. See Rule 28-106.111(4), Florida Administrative Code.

14.    Respondent has not alleged any basis for equitable tolling. See Patz v. Dept. Of Health, 864 So. 2d 79 (Fla. 3d DCA 2003).

Shaun Paul Golden
Golden Wealth Management
Page 4 of 5

15.    The legal conclusions that form the basis for the allegations set forth in the

Administrative Complaint, being uncontested by Respondents, are accepted as true and correct

and are adopted by the Office as Conclusions of Law for purposes of this Final Order.

## FINAL ORDER

Based on the foregoing Findings of Fact and Conclusions of Law, it is hereby

**ORDERED**:

16.    Respondents to cease and desist from violations of Chapter 517, Florida Statutes,

and any rule or order promulgated by the Office.

17.    Golden is barred permanently from submitting an application or notification for a

license or registration with the Office.

18.    GWM is barred permanently from submitting an application or notification for a

license or registration with the Office.

**DONE and ORDERED** this ___8th___ day of February 2017, in Tallahassee, Leon

County, Florida.


Drew J. Breakspear, Commissioner
Office of Financial Regulation

Shaun Paul Golden
Golden Wealth Management
Page 5 of 5

## NOTICE OF RIGHTS

A PARTY WHO IS ADVERSELY AFFECTED BY THIS FINAL ORDER IS ENTITLED TO JUDICIAL REVIEW PURSUANT TO SECTION 120.68, FLORIDA STATUTES. REVIEW PROCEEDINGS ARE GOVERNED BY THE FLORIDA RULES OF APPELLATE PROCEDURE. SUCH PROCEEDINGS ARE COMMENCED BY FILING THE ORIGINAL NOTICE OF APPEAL WITH THE AGENCY CLERK, OFFICE OF FINANCIAL REGULATION, GENERAL COUNSEL'S OFFICE, POST OFFICE BOX 8050 TALLAHASSEE, FLORIDA 32314-8050, AND A COPY, ACCOMPANIED BY FILING FEES PRESCRIBED BY LAW, WITH THE DISTRICT COURT OF APPEAL, FIRST DISTRICT, 2000 DRAYTON DRIVE, TALLAHASSEE, FLORIDA 32399-0950, OR WITH THE DISTRICT COURT OF APPEAL IN THE APPELLATE DISTRICT WHERE THE PARTY RESIDES. THE NOTICE OF APPEAL MUST BE FILED WITHIN 30 DAYS OF RENDITION OF THE ORDER TO BE REVIEWED.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Final Order was furnished by U.S. Mail to Golden Wealth Management, 496 Wainscott Harbor Road Sagaponack, NY 11962 on this __8th__ day of February 2017.

Agency Clerk
Florida Office of Financial Regulation
Tallahassee, Florida 32314-8050
Post Office Box 8050
E-mail: Agency.Clerk@flofr.com
Tel: (850) 410-9889
Fax: (850) 410-9663

EXHIBIT

*A*

# STATE OF FLORIDA
## OFFICE OF FINANCIAL REGULATION

IN RE:

SHAUN PAUL GOLDEN, CRD# 2629946,

GOLDEN WEALTH MANAGEMENT,
INC., CRD# 157893,

　　　　　Respondents.

Administrative Proceeding
No: 68851-S

91 7199 9991 7035 4563 0526

## ADMINISTRATIVE COMPLAINT AND NOTICE OF RIGHTS

The State of Florida, Office of Financial Regulation ("Office"), pursuant to Section

20.121, Florida Statutes[1], being authorized and directed to administer and enforce the Florida

Securities and Investor Protection Act, Chapter 517, Florida Statutes ("Act"), and having reason

to believe that Shaun Paul Golden ("Golden"), CRD# 2629946, and Golden Wealth

Management, Inc. ("GWM"), CRD# 157893 (collectively the "Respondents"), have violated the

Act, hereby files this Administrative Complaint and Notice of Rights ("Complaint"). The Office

hereby gives notice to Respondents that pursuant to Chapter 517, Florida Statutes, the Office will

enter a FINAL ORDER imposing statutory penalties authorized by Chapter 517, Florida Statutes,

which may include revocation, bar, or suspension of registrations in this State, the issuance of a

cease and desist order, and the imposition of administrative fines. In support thereof, the Office

states the following:

---

[1] All references are to Florida Statutes (2011) unless otherwise indicated.

1

1.      The Office is the state agency charged with the administration and enforcement of Chapter 517, Florida Statutes, and the rules promulgated thereunder, pursuant to Section 20.121(3)(a)2., Florida Statutes, and Section 517.03(1), Florida Statutes.

2.      The Office has jurisdiction over Respondents pursuant to the provisions of Chapter 517, Florida Statutes.

3.      Golden's address of record is 156 Chardonnay Drive, East Quogue, NY 11942.

4.      Golden is the Owner, President and Chief Operating Officer of GWM, which makes Golden a principal and director of GWM.

5.      Golden has the power to direct GWM due to his ownership of GWM.

6.      GWM is a registered investment adviser located at 496 Wainscott Harbor Road, Sagaponack, NY 11962.  GWM's mailing address is P.O. Box 1295, Sagaponack, NY 11962.

7.      GWM has been registered in Florida as an investment advisor since November 23, 2011.

8.      Golden has been registered in Florida as an associated person of GWM since November 23, 2011.

9.      On or about July 7, 2011, GWM submitted a Uniform Application for Investment Adviser Registration ("Form ADV") application to the Office for registration as an investment adviser in Florida.

10.     On or about July 20, 2011, Golden submitted a Uniform Application for Securities Industry Registration or Transfer ("Form U-4") application to the Office for registration as an associated person of GWM.

11.     Golden answered "No" in response to Question 14G(2), of the Form U-4 for application as an associated person of an investment advisor, which states "Have you been

2

notified, in writing, that you are not the subject of any…(2)investigation that could result in a "yes" answer to any part of 14A, B, C, D, or E?"

12.    Golden was informed on or before September 20, 2011, that Golden was the subject of a Financial Industry Regulatory Authority ("FINRA") investigation.

13.    Golden failed to update his Form U-4 application to reflect he was notified in writing that he was the subject of an investigation by FINRA that could result in a bar from associating with any FINRA member in any and all capacities.

14.    On or about November 23, 2011, the Office approved GWM's Form ADV application for registration as an investment adviser.

15.    On or about November 23, 2011, the Office approved Golden's Form U-4 application for registration as an associated person of GWM.

16.    On or about November 30, 2011, in case number 2010025157701, FINRA accepted an Acceptance, Waiver and Consent ("AWC") entered into by Golden.

17.    Pursuant to the AWC, FINRA found Golden violated FINRA Rules 8210 and 2010.

18.    Pursuant to the AWC, Golden consented to a bar from associating with any FINRA member firm in any and all capacities

## COUNT I – MAKING A FALSE STATEMENT IN THE APPLICATION FOR
## REGISTRATION

19.    Paragraphs 1 through 18 are re-alleged and incorporated by reference as if set forth fully herein.

20.    Section 517.161(1)(b), Florida Statutes, provides that registration under Section 517.12, Florida Statutes, may be denied or any registration granted may be revoked, restricted, or

3

suspended by the office if the office determines that such applicant or registrant; any member, principal, or director of the applicant or registrant or any person having a similar status or performing similar functions; or any person directly or indirectly controlling the applicant or registrant has made a material false statement in the application for registration.

21.    Rule 69W-600.002(1)(c), Florida Statutes, provides, in part, if the information contained in any Form U-4 becomes inaccurate for any reason before or after the associated person becomes registered, the associated person through the dealer or investment adviser, as applicable, shall be responsible for correcting the inaccurate information within thirty (30) days. If the information being updated relates to the applicant's or registrant's disciplinary history, in addition to updating the Form U-4, the associated person through the dealer or investment adviser shall also provide the Office of Financial Regulation with notice and copies of each civil, criminal or administrative action initiated against the associated person as provided in Rule 69W-600.010, Florida Administrative Code.

22.    Golden failed to update his Form U-4 application to reflect he was notified in writing that he was the subject of an investigation by FINRA that could result in a bar from associating with any FINRA member in any and all capacities, which constitutes a material false statement in Golden's application for registration as an associated person of GWM.

23.    By the conduct described above, Golden violated Section 517.161(1)(b), Florida Statutes, by making a material false statement in his application for registration as an associated person of GWM.

## COUNT II – BEING SUBBJECT TO AN INDUSTRY BAR

24.    Paragraphs 1 through 18 are re-alleged and incorporated by reference as if set forth fully herein.

4

25.     Section 517.161(1)(m), Florida Statutes, provides that registration under Section 517.12, Florida Statutes, may be denied or any registration granted may be revoked, restricted, or suspended by the office if the office determines that such applicant or registrant; any member, principal, or director of the applicant or registrant or any person having a similar status or performing similar functions; or any person directly or indirectly controlling the applicant or registrant has been the subject of any decision, finding, injunction, suspension, prohibition, revocation, denial, judgment, or administrative order by any court of competent jurisdiction, administrative law judge, or by any state or federal agency, national securities, commodities, or option exchange, or national securities, commodities, or option association, involving a violation of any federal or state securities or commodities law or any rule or regulation promulgated thereunder, or any rule or regulation of any national securities, commodities, or options exchange or national securities, commodities, or options association, or has been the subject of any injunction or adverse administrative order by a state or federal agency regulating banking, insurance, finance or small loan companies, real estate, mortgage brokers or lenders, money transmitters, or other related or similar industries.

26.     Section 517.021(5), Florida Statutes, provides "control," including the terms "controlling," "controlled by," and "under common control with," means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a person, whether through the ownership of voting securities, by contract, or otherwise.

27.     Section 517.021(17), Florida Statutes, provides "principal" means an executive officer of a corporation, partner of a partnership, sole proprietor of a sole proprietorship, trustee of a trust, or any other person with similar supervisory functions with respect to any organization, whether incorporated or unincorporated.

5

28.     Golden was the subject of the FINRA AWC barring Golden from associating with any FINRA member in any and all capacities.

29.     Golden is a principal and director of GWM.

30.     Golden has control of GWM.

31.     By the conduct described above, Golden violated Section 517.161(1)(m), Florida Statutes, by being the subject of a finding by a national securities association involving a violation of the rules of said national securities association.

32.     By the conduct described above, GWM violated Section 517.161(1)(m), Florida Statutes, by having a principal or director of GWM, or any person directly or indirectly controlling GWM, being the subject of a finding by a national securities association involving a violation of the rules of said national securities association.

## SANCTIONS

### Cease and Desist

33.     Section 517.221(1), Florida Statutes, authorizes the Office to issue and serve upon any person a CEASE AND DESIST order whenever the Office has reason to believe that such person is violating, has violated, or is about to violate any provision of Chapter 517, Florida Statutes, or any rule or order promulgated by the Office.

### Administrative Fine

34.     Section 517.221(3), Florida Statutes, provides that the Office may impose and collect an administrative fine against any person found to have violated any provision of Chapter 517, Florida Statutes, or any rule or order promulgated by the Office in an amount not to exceed $10,000 for each such violation.

### Registration Bar

6

35.    Section 517.221(4), Florida Statutes, authorizes the Office to bar permanently or

for a specific time period any person found to have violated any provision of Chapter 517,

Florida Statutes, or any rule or order promulgated by the Office, from submitting an application

or notification for a license or registration with the Office.

<u>**Registration Denial, Revocation, Restriction, or Suspension**</u>

36.    Section 517.161(1)(a), Florida Statutes (2011, 2016), authorizes the Office to

deny, revoke, restrict, or suspend a registration of a person for the violation of any provision of

Chapter 517, Florida Statutes, or any rule or order promulgated by the Office.

37.    Section 517.161(1)(b), Florida Statutes (2011, 2016), authorizes the Office to

deny, revoke, restrict, or suspend a registration of a person if the office determines that such

applicant or registrant; any member, principal, or director of the applicant or registrant or any

person having a similar status or performing similar functions; or any person directly or

indirectly controlling the applicant or registrant has made a material false statement in the

application for registration.

38.    Section 517.161(1)(m), Florida Statutes (2011, 2016), authorizes the Office to

deny, revoke, restrict, or suspend a registration of a person if the office determines that such

applicant or registrant; any member, principal, or director of the applicant or registrant or any

person having a similar status or performing similar functions; or any person directly or

indirectly controlling the applicant or registrant has been the subject of any decision, finding,

injunction, suspension, prohibition, revocation, denial, judgment, or administrative order by any

court of competent jurisdiction, administrative law judge, or by any state or federal agency,

national securities, commodities, or option exchange, or national securities, commodities, or

option association, involving a violation of any federal or state securities or commodities law or

7

any rule or regulation promulgated thereunder, or any rule or regulation of any national securities, commodities, or options exchange or national securities, commodities, or options association, or has been the subject of any injunction or adverse administrative order by a state or federal agency regulating banking, insurance, finance or small loan companies, real estate, mortgage brokers or lenders, money transmitters, or other related or similar industries.

Disciplinary Guidelines

39.    The Office's disciplinary guidelines are set forth at Rule 69W-1000.001, Florida Administrative Code, pursuant to Section 517.1611(1), Florida Statutes, and may be accessed via the internet at http://www.flofr.com/securities/index/htm.

PROPOSED AGENCY ACTION

40.    NOTICE IS HEREBY PROVIDED that the Office will enter a Final Order in this matter, subject only to the Notice of Rights herein. In its Final Order, the Office will:

   a.  Order SHAUN PAUL GOLDEN and GOLDEN WEALTH MANAGEMENT, INC. to CEASE AND DESIST from violations of Chapter 517, Florida Statutes, and any rule or order promulgated by the Office.

   b.  Impose an administrative fine against SHAUN PAUL GOLDEN and GOLDEN WEALTH MANAGEMENT, INC.

   c.  Bar permanently or a for specific time period SHAUN PAUL GOLDEN and GOLDEN WEALTH MANAGEMENT, INC. from submitting an application or notification for a license or registration with the Office.

   d.  Deny, revoke, restrict, or suspend the registration of SHAUN PAUL GOLDEN and GOLDEN WEALTH MANAGEMENT, INC.

   e.  Impose any other action or further relief as may be necessary and appropriate.

8

## NOTICE OF RIGHTS

**NOTICE IS HEREBY GIVEN** that you may request a hearing to be conducted in accordance with the provisions of Sections 120.569 and 120.57, Florida Statutes. A request for such a hearing must comply with the provisions of Rules 28-106.201, 28-106.2015 or 28-106.301, Florida Administrative Code. Pursuant to Rule 28-106.111(2), Florida Administrative Code, your request must be filed **within twenty-one (21) days after the receipt of this Administrative Complaint** and must be filed with:

Agency Clerk
Office of Financial Regulation
P.O. Box 8050
Tallahassee, Florida 32314-8050
Phone (850) 410-9889
Facsimile: (850) 410-9663

Failure to respond within twenty-one (21) days of receipt of this Administrative Complaint shall be deemed a waiver of all rights to a hearing, and a Final Order will be entered without further notice. Should you request such a hearing, you will have the right to be represented by counsel or other qualified representative to offer testimony, either written or oral, to call and cross-examine witnesses, and to have subpoenas and subpoenas duces tecum issued on your behalf.

Pursuant to Section 120.573, Florida Statutes, you are advised that mediation is not available.

Signed this _10th_ day of November, 2016.

STATE OF FLORIDA
OFFICE OF FINANCIAL REGULATION

9

Cody Bilgrien
Assistant General Counsel
Florida Bar 0117619
Office of Financial Regulation
P.O. Box 8050
Tallahassee, Florida 32314-8050
Telephone: (850) 410-9561
Cody.Bilgrien@flofr.com

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on this 10th day of November, 2016, a true and correct copy of the foregoing Administrative Complaint was sent by certified mail, return receipt requested, to the following:

> Shaun Paul Golden
> Golden Wealth Management, Inc.
> 496 Wainscott Harbor Road
> Sagaponack, NY, 11962

and by regular U.S. mail to:

> Shaun Paul Golden
> Golden Wealth Management
> P.O. Box 1295
> Sagaponack, NY 11962

Cody Bilgrien
Assistant General Counsel
Florida Bar 0117619
Office of Financial Regulation
P.O. Box 8050
Tallahassee, Florida 32314-8050
Telephone: (850) 410-9561
Cody.Bilgrien@flofr.com

11

 **UNITED STATES**
**POSTAL SERVICE**


EXHIBIT
*B*

Date: December 8, 2016

Cody Bilgrien:

The following is in response to your December 8, 2016 request for delivery information on your Certified Mail™ item number 9171999991703545630526. The delivery record shows that this item was delivered on November 17, 2016 at 12:56 pm in SAGAPONACK, NY 11962. The scanned image of the recipient information is provided below.

Signature of Recipient :

Address of Recipient :

Thank you for selecting the Postal Service for your mailing needs.

If you require additional assistance, please contact your local Post Office or postal representative.

Sincerely,
United States Postal Service

Filing # 61378462 E-Filed 09/06/2017 01:16:08 PM

**IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT**
**IN AND FOR PINELLAS COUNTY, STATE OF FLORIDA**
**CIVIL DIVISION**

**Deborah Waldemar,** individually and as owner
of her IRA,

                                 **Plaintiff**,              Case No. _____

v.

**Shaun P. Golden,** individually, and
**Golden Wealth Management, Inc.**, a
New York corporation,

                                 **Defendants**.

_____/

**EXHIBIT "B" to Complaint**

***ELECTRONICALLY FILED 09/06/2017 03:34:17 PM: KEN BURKE, CLERK OF THE CIRCUIT COURT, PINELLAS COUNTY***

**Golden Wealth Management, Inc.**

**FINANCIAL & ESTATE PLANNING AGREEMENT**

This Agreement is entered as of the **22th** day of **January 2015** between **Golden Wealth Management, Inc.** ("the Advisor") and the **Deborah Waldemar** ("the Client(s)").

## FINANCIAL PLANNING SERVICE(S)

We shall discuss our recommendations, which may include topics such as insurance, taxes, retirement needs, investments, estate planning, etc. with you. The Advisor's recommendations may be implemented, at your sole discretion, with the professional advisor(s) of your choosing (including your broker, accountant, attorney, etc.). This agreement covers services and fees provided by the Advisor for financial planning, estate planning and any time spent on your requested matter only as described herein. The Client understands that the Advisor is a registered investment advisor with the States of New York and Florida and also provides investment advisory services for clients. The Client is not obligated to use the investment advisory services of the Advisor to implement any or all aspects of the financial advice developed by this Agreement, but may choose to do so. Any investment advisory services requested of the Advisor by the Client will be defined and agreed to in a separate investment advisory agreement. The Client acknowledges that in respect to estate planning and tax planning, our role shall be that of a facilitator between you and your designated professional advisor(s). When performing services under this Agreement, the Advisor is neither your attorney nor your accountant, and no portion of a financial plan or any services rendered by the Advisor should be interpreted by you as legal or accounting advice. The Advisor recommends that you seek the advice of a qualified attorney and accountant. The accuracy and completeness of the information you provide will allow us to give you a better understanding of the possible outcomes.

## HOURLY FEES & TIME BASED BILLING

The Client acknowledges the fact that the Advisor has fully explained the entire structure upon which this contractual relationship is based. The Advisors hourly fee will be billed at a rate of $395.00 per hour plus disbursements for any time spent on your matter. Hourly fee-based clients may be billed on a monthly or quarterly basis upon completion of any work performed. Payment for such services will be automatically deducted from your investment account unless other terms are arranged (such as direct invoice billing) and agreed. Our Fees will be determined by the time devoted to your matter, billed at the rate of $395.00 per hour plus disbursements. The time spent performing services is measured in units of tenths of an hour (.10 = 6 minutes), all services having a minimum time charge of .20 hours for any work conducted on your behalf (i.e. meetings, research, analysis, document preparation, telephone calls, document review and requests, estate planning etc.), and if such work extends beyond .20 hours, then you will be charged in additional increments of .10 hours.

Client agrees to be charged the $395.00 hourly rate.

(Client initials)   (Advisor initials)

## CLIENT'S RESPONSIBILITY
The Client will furnish at all times the Advisor with complete and accurate information concerning the Client's financial and economic situation, the Client's investment objectives, and any restrictions the Client wishes to impose. Client represents that all financial and other data that it furnishes to Advisor relating to Client's assets, liabilities, present and future income and obligations are true and correct and may be relied upon by Advisor for the purposes of providing the services described in this Agreement.

## TERM OF AGREEMENT
The hourly based fee billing will survive and continue for any and all new or future projects or matters conducted on your behalf. Either party may terminate this Agreement upon giving written notice to the other party. If this Agreement is terminated and fees are due to the Advisor, the Advisor will send an invoice to the Client. The Client agrees to pay this invoice within ten business days of receiving the invoice. **Notwithstanding any other provision in this Agreement, the Client may terminate this Agreement within five business days of its effective date without payment of any fee for the Advisor's services.**

## BROKERAGE SERVICES
The Client hereby agrees that he/she may choose any investment or insurance broker, brokerage firm or broker/dealer he/she wishes for the implementation of the suggestions and recommendations made by the Advisor.

It is expressly agreed between the Client and Advisor that the Client is free to follow or disregard, in whole or part, any recommendations, suggestions, or advice made by the Advisor to the client.

## ASSIGNMENT
No assignment of this Agreement shall be permitted without the express written consent of all parties to this Agreement.

## SEVERABILITY
If any provision or provisions of this Agreement is found to be illegal or invalid for any reason, the illegality or invalidity shall not affect the remaining provisions of this Agreement but shall be fully severable and the Agreement shall be construed and enforced as if the illegal or invalid provision had never been included.

## PARTIES BOUND
This Agreement shall be binding on the parties to it and their heirs, estate, executors, administrators, successors, and assigns.

2

**NOTICE**
Any and all written notices, designations, disclosures, consents, offers, acceptances, or any other written communication provided for in this Agreement shall be personally delivered or delivered by mail, postage prepaid, to the address shown below the party's signature, unless notice of change of address is furnished in the manner provided in this paragraph. Notice shall be deemed received (a) if personally delivered, on the date of its delivery or (b) if mailed, on the date of its deposit, postage prepaid, in the United States mail.

**CONFIDENTIALITY**
None of the information and data which client provides will be disclosed by Advisor to any other non-related firm, person or entity without the prior written consent of Client, unless such disclosure is required by law.

**ENTIRE AGREEMENT**
This Agreement embodies all understandings and agreements of the parties to it with respect to the subject matter of this Agreement and the terms and conditions of this Agreement. This Agreement may not be amended except in writing signed by both of the parties.

**GOVERNING LAW**
This Agreement shall be governed and construed according to the laws of the State of New York.

**ACKNOWLEDGMENTS**
The Client acknowledges receipt of the Form ADV Part 2 disclosure brochure and the Advisor's Privacy Notice. All information and advice furnished by either party to the other will be treated as confidential and will not be disclosed to third parties except as required by law.

**NOTICE OF TERMINATION**
The Client has the right to terminate this contract within five business days of entering into this contract, without penalty. Either the Advisor or the Client may terminate this contract at any time by delivering a written notice to the other party. In such an event, Client will receive a pro rata refund of fees prepaid for the portion of the contract period following termination.

3

If the foregoing currently states our understanding, kindly sign and return to us the enclosed copy of this contract. An additional signed copy marked "please retain for your records" is also being provided.

_____01-22-15_____          _____
          Date                        Shaun P. Golden, President

Accepted and agreed to as of

_____01/22/2015_____            _____
          Date                            Date
_Deborah Waldemar_
     Deborah Waldemar

4

**IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
IN AND FOR PINELLAS COUNTY, STATE OF FLORIDA
CIVIL DIVISION**

**Deborah Waldemar,** individually and as owner
of her IRA**,**

                                    **Plaintiff,**                    Case No. _____

v.

**Shaun P. Golden,** individually, and
**Golden Wealth Management, Inc.**, a
New York corporation,

                                    **Defendants**.

_____/

**EXHIBIT "C" to Complaint**

## INVESTMENT MANAGEMENT AGREEMENT

This INVESTMENT MANAGEMENT AGREEMENT, dated as of **January 22, 2015** (together with the Schedules and Exhibits attached hereto, this "**Agreement**"), is made and entered into by and between **Deborah Waldemar** (the "**Client**"), and **Golden Wealth Management, Inc**, a Registered Investment Advisor (the "**Investment Manager**").

## W I T N E S S E T H :

**WHEREAS**, the Investment Manager is engaged in the business of managing investment funds and/or separately managed accounts;

**WHEREAS**, the Client wishes to retain the Investment Manager to manage certain assets of the Client in accordance with the terms and conditions of this Agreement (the account maintained by the Custodian, as defined in Section 3 below, holding such assets, together with income, profit or gain thereon, is hereinafter referred to as the "Separate Account"), and the Investment Manager is willing to accept such appointment in such capacity as further set forth herein.

**NOW, THEREFORE**, in exchange for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.    Appointment of Investment Manager

The Client hereby appoints the Investment Manager, and the Investment Manager hereby accepts such appointment, to provide investment advice and to manage and direct the investment of the assets in the Separate Account in accordance with the terms of this Agreement. During the term of this Agreement the Investment Manager shall have discretionary authority for the management of the assets in the Separate Account, subject to the Investment Guidelines and Additional Instructions (as defined below).

2.    Management of the Separate Account and Compliance with Investment Guidelines and Additional Instructions

(a)    The Investment Manager agrees to perform its duties hereunder pursuant to the terms and conditions specified in this Agreement, including the Investment Guidelines and Objectives set forth in Schedule A (the "Investment Guidelines") and, following delivery thereof, any other specific restrictions and directions which the Client shall provide to the Investment

Manager in writing ("Additional Instructions"). The Investment Manager acknowledges and agrees that it is acting as a fiduciary with respect to the Client's assets in the Separate Account.

(b)     The Investment Manager shall continually monitor the Separate Account and make purchases, sales, exchanges, conversions, redemptions, investments and reinvestments in accordance with the Investment Guidelines and any Additional Instructions. The Investment Manager shall consult with the Client from time to time as necessary to review the Investment Guidelines and shall provide the Client reasonable written notice of any anticipated or contemplated changes to the Investment Manager's general investment strategy.

(c)     The Client acknowledges and understands that the net investment performance of the Separate Account may differ from the net investment performance of other accounts managed by the Investment Manager (the "Other Accounts"), and there may be circumstances where trades will not be allocated between the Separate Account and the Other Accounts on a *pari passu* basis, due to (i) the frequency or amount of additions and withdrawals of assets to and from the Separate Account and/or the Other Accounts; (ii) different counterparty fees and costs associated with the Separate Account; (iii) odd lots and/or small allocations; (iv) tax, legal or regulatory requirements, and (v) the Investment Guidelines and Additional Instructions.

(d)     The Investment Manager shall not engage any other person to manage or advise any portion of the Separate Account without the prior written consent of the Client and no employee, contractor or other agent of the Investment Manager shall be authorized to manage or advise any portion of the Separate Account without the Client's prior written authorization.

(e)     The Investment Manager shall have no authority to act for, represent, bind or obligate the Client except as specifically provided herein.

3.    Custody

The cash and assets of the Separate Account shall be held in the custody of the firm designated by the Client to provide custody for the Separate Account's assets (the "Custodian"). The initial Custodian will be Interactive Brokers, LLC. In the event that the Client has a pre-existing relationship with the Custodian, the Client shall instruct the Custodian to designate a specific account for these assets and to record transactions relating to these assets separately from transactions involving other assets of Client which are not assets of the Separate Account. So long as this Agreement has not been terminated, the Investment Manager shall be entitled to direct the Custodian with respect to the purchase, sale and delivery of investments made pursuant to this Agreement, and provided such transactions are within the Investment Guidelines or any Additional Instructions, the Client agrees to provide such written authorization to the Custodian or the Investment Manager as shall be necessary to carry out the provisions of this Agreement. All investment transactions executed by the Investment Manager pursuant to the authority granted by this Agreement shall be custodied with the Custodian or its successor appointed by the Client. The Investment Manager shall under no circumstances (i) act as custodian for the Separate Account, (ii) take or have title to or possession of the assets held in the Separate Account, or (iii) contribute capital or securities to, or issue instructions to the Custodian to

2

withdraw any cash or securities from, the Separate Account. The Investment Manager shall not have the power or authority to amend the terms of the Client's custody arrangements with respect to the Separate Account or to appoint an alternate custodian without the Client's prior written consent.

4.    Brokerage

    The Investment Manager shall have full discretion to select brokers or dealers to effect the purchase and sale of securities for the Separate Account on behalf of the Client; *provided however* that the Investment Manager is prohibited from selecting brokers or dealers that are directly or indirectly affiliated with the Investment Manager or any of its officers, directors and employees, or that is an entity with which the Investment Manager has an express or implied agreement regarding the sharing of commissions, profit sharing or the like, or that the Client has otherwise expressly prohibited in writing. In selecting brokers or dealers to execute orders for the purchase or sale of securities for the Separate Account, the Investment Manager shall use its best efforts to obtain prompt execution of orders placed on behalf of the Client at the most favorable prices obtainable, and in doing so shall consider a number of factors, including, without limitation, the overall direct net economic result to the Separate Account, the financial strength and stability of the broker, the efficiency with which the transaction is effected, the ability to effect the transaction at all where a large block is involved, the availability of the broker to stand ready to execute possibly difficult transactions in the future and other matters involved in the receipt of "brokerage and research services" as defined in and in compliance with Section 28(e) of the Securities Exchange Act of 1934, as amended (the "Exchange Act").

5.    Record Keeping and Reports

    (a)    With respect to the Separate Account, the Investment Manager shall keep complete and accurate books and records relating to its transactions; take all reasonable steps to assist the Custodian and Client in keeping accurate and detailed records of all transactions.

    (b)    The Investment Manager shall make appropriate personnel reasonably available to the Client and its designated agents or representatives at the Client's expense for discussions concerning the management of the assets in the Separate Account as well as the business and operations of the Investment Manager and its affiliates (i) on a reasonable basis via telephone and (ii) in person at the offices of the Client as reasonably requested by the Client (but no less than quarterly).

    (c)    The Investment Manager shall permit the duly authorized representatives of the Client at the Client's expense and upon reasonable notice to the Investment Manager to inspect and copy documentation directly relating to transactions with respect to the Separate Account. The Investment Manager shall keep all records relating to the Separate Account (and in the case of electronic data, a printout thereof) for not less than five (5) years. This Section 5(c) shall survive the termination of this Agreement.

3

6.     Allocation

(a)     Provided the investment objectives of the Separate Account are being followed and the Investment Manager otherwise complies with the terms of this Agreement, including the Investment Guidelines and any Additional Instructions, the Investment Manager may aggregate sale and purchase orders of securities held in the Separate Account with similar orders being made simultaneously for other accounts managed by the Investment Manager if, in the reasonable judgment of the Investment Manager, such aggregation will result in an overall economic benefit to the Separate Account as based on an evaluation that the Separate Account is benefited by relatively better purchase or sale prices, lower commission expenses and beneficial timing of transactions, or a combination of these and other factors. In such event, allocation of the securities so purchased or sold, as well as the expenses reasonably incurred in the transaction, shall be made by the Investment Manager in an equitable manner consistent with its fiduciary obligations to the Client and to such other accounts.

(b)     The Investment Manager shall not (i) engage in any principal transactions subject to Section 206(3) of the Advisers Act, agency cross trades or cause the Separate Account to purchase securities or assets from any person or entity affiliated with the Investment Manager, or (ii) purchase for the Separate Account any securities for which the Investment Manager acts as sponsor, underwriter or agent or for which the Investment Manager will receive remuneration, in each case, without the Investment Manager fully disclosing the nature of such relationship to the Client in writing and the Client providing its prior written consent.

7.     Proxy Voting

The Client shall be responsible for all decisions concerning the voting of proxies for securities held in Client accounts. The Advisor cannot give any advice or take any action with respect to the voting of these proxies.

8.     Contributions and Withdrawals

(a)     The Client intends to make an initial contribution to the Separate Account equal to USD $425,000 on or about January 22, 2015 (the "Initial Contribution" and the date on which the Initial Contribution is made to the Separate Account is hereinafter referred to as the "Initial Contribution Date"). Upon the consent of the Investment Manager, the Client may, but shall not be obligated to, make one or more additional contributions to the Separate Account (each, an "Additional Contribution"). Any such Additional Contribution shall be made at such time, and in such amount, as the Client and the Investment Manager may mutually agree in writing.

4

(b)    Notwithstanding Section 8(a) or anything to the contrary contained herein, the Client in its sole and absolute discretion may, at any time, withdraw all or any portion of the cash balance in the Separate Account.  In the event the Client wishes to withdraw from the Separate Account an amount that exceeds the cash balance then available in the Separate Account, the Investment Manager shall, immediately upon notice from the Client, liquidate securities positions in the Separate Account in an amount necessary to fund in cash the full amount of the withdrawal. For the avoidance of doubt, the Investment Manager shall have sole discretion in determining which securities positions to liquidate for purposes of funding any such withdrawal.

(c)    The Client shall endeavor in good faith to provide the Investment Manager with at least 30 calendar days' notice of any withdrawal, but shall have no obligation to provide such notice.

9.    Representations and Warranties

(a)    The Investment Manager represents and warrants that:

(i)    it is a corporation duly organized, validly existing and in good standing under the laws of the State of New York, has the power and authority to carry on the business of the Investment Manager and has the power and authority to execute, deliver and perform this Agreement;

(ii)    this Agreement has been duly authorized, executed and delivered by the Investment Manager and is the valid and binding obligation of the Investment Manager enforceable against it in accordance with its terms except as limited by bankruptcy and insolvency laws and principles and doctrines of equity;

(iii)    it has made, obtained and performed all other registrations, filings, approvals, authorizations, consents, licenses or examinations required by any government or governmental or quasi-governmental authority, domestic or foreign, or required by any other person, corporation or other entity in order to operate its business and to execute, deliver and perform this Agreement;

(iv)    neither the execution and delivery nor the performance of this Agreement by the Investment Manager will violate any law, statute, order, rule or regulation or judgment, order or decree by any federal, state, local or foreign court or governmental authority, domestic or foreign, to which the Investment Manager is subject nor will the same constitute a breach of, or default under, provisions of any agreement or contract to which it is a party or by which it is bound;

(v)    it is under no contractual obligation with any other person or entity, that would prevent it from being able to enter into this Agreement; the Client

5

has not, in any way, induced the Investment Manager's decision to terminate any pre-existing contractual arrangements with any other person or entity; neither the Investment Manager, nor its principals or other employees are bound by any agreement with former partners, employers, associates, entities or persons that would prevent the relationship between the Investment Manager and the Client or that would subject the Client to liability;

(vi)     it owns, and possesses the exclusive right to use, all intellectual property comprising the investment strategies that it may use in its performance of this Agreement, and no other person is, nor will be, permitted to use any such intellectual property during the term of this Agreement unless the Investment Manager has provided to the Client 90 days' prior written notice of such permission;

(vii)    there is no pending nor, to the knowledge of the Investment Manager, threatened action, suit, proceeding, or investigation before or by any court, arbiter, governmental, regulatory, self-regulatory or exchange body or agency to which the Investment Manager or any of its principals is a party which has been brought or is threatened to be brought by any prior or existing clients of Investment Manager or that otherwise might reasonably be expected to result in any material adverse change in the condition, financial or otherwise, business or prospects of the Investment Manager or its principals or their ability to perform their obligations under this Agreement (including, without limitation, any action, suit, proceeding, or investigation relating to any intellectual property that the Investment Manager may use in its performance of this Agreement);

(viii)   if it is required to be registered as an investment adviser under the Advisers Act, or under the laws of any state or other jurisdiction, it has so registered and such registration is currently effective; and

(ix)     it is registered or otherwise not required to be registered with the Commodity Futures Trading Commission as a "commodity pool operator" or "commodity trading advisor" within the meaning of the Commodity Exchange Act, as amended.

The foregoing representations and warranties shall be continuing during the term of this Agreement, and shall be deemed made both (i) as of the date of this Agreement and (ii) as of each subsequent date on which this Agreement remains in effect. If at any time any of the foregoing representations or warranties becomes untrue or inaccurate in any material respect, the Investment Manager shall promptly notify the Client in writing of the change in circumstances affecting the truth or accuracy of such representation or warranty.

(b)      The Client represents and warrants that:

6

(i)     it has the power and authority to carry on the transactions contemplated by this Agreement and has the power and authority to execute, deliver and perform this Agreement;

(ii)    this Agreement has been duly authorized, executed and delivered by the Client and is the valid and binding obligation of the Client enforceable against it in accordance with its terms except as limited by bankruptcy and insolvency laws and principles and doctrines of equity;

(iii)   upon the Initial Contribution and the date of any Additional Contribution, the Client is and will be, as applicable, an "accredited investor" as that term is defined in Rule 501 of Regulation D promulgated under the Securities Act of 1933, as amended; and

(iv)    upon the Initial Contribution and the date of any Additional Contribution, the Client is and will be, as applicable, a "qualified client" as that term is defined in Rule 205-3 under the Advisers Act.

10.    <u>Covenants and Acknowledgments of the Investment Manager</u>

(a)     The Investment Manager covenants and agrees to comply with all laws, regulations and rules applicable to it in its capacity as Investment Manager and in its performance of this Agreement.

(b)     The Investment Manager shall promptly notify the Client in writing of its inability to comply with any term or provision of this Agreement (including the Investment Guidelines or any Additional Instructions) in any material respect and shall report to the Client as soon as practicable, and in any case within 48 hours of its discovery:

(i)     any change in the Investment Manager's principals, shareholders, members, directors, portfolio managers or senior officers;

(ii)    any adverse change in the Investment Manager's condition, financial or otherwise, or in its business, or any other change which is reasonably likely to be materially adverse to the Investment Manager, the Separate Account or the Other Accounts;

(iii)   any material breach by the Investment Manager of any obligation or representation under this Agreement;

(iv)    any dissolution of the Investment Manager or commencement of a bankruptcy proceeding involving the Investment Manager or appointment of a receiver over any of its assets;

(v)    any communication from regulatory agencies or government representatives concerning investigations or allegations of noncompliance with the laws, rules or regulations of any jurisdiction by the Investment Manager or its employees or affiliates in connection with their duties on behalf of Investment Manager;

(vi)    any commencement of a formal investigation or an enforcement proceeding by the Securities Exchange Commission or any state commission or self-regulatory organization or any government or government agency with respect to the Investment Manager or any principal or portfolio manager thereof;

(vii)    the commencement of any formal proceeding against the Investment Manager or any of its employees or principals which alleges any negligence or contractual or fiduciary breach related to the performance of management services by Investment Manager or any, principal, portfolio manager or other employee of Investment Manager or which, if successful, could result in a material adverse change in the financial condition of the Investment Manager;

(viii)    a portfolio manager or a principal is indicted for a felony criminal offense; or

(ix)    an event that would have a material adverse effect on the Investment Manager's ability to invest the assets in the Separate Account in accordance with the Investment Guidelines or any Additional Instructions.

11.    Termination

(a)    This Agreement may be terminated at any time by the Client upon not less than thirty (30) days prior written notice to the Investment Manager; *provided,* however that this Agreement may be terminated immediately by Client upon a material breach of this Agreement by the Investment Manager. Unless the Client provides written notice to the contrary, upon receipt by the Investment Manager of notice of the Client's intent to terminate this Agreement, the Investment Manager shall immediately cease all further investment activities and use its best efforts to liquidate the assets held in the Separate Account in an orderly fashion in consultation with the Client upon the best possible terms reasonably available for the Client, taking into account factors including, but not limited to, applicable regulatory considerations, market impact and available liquidity.

(b)    This Agreement may be terminated by the Investment Manager upon not less than thirty (30) days prior written notice to the Client at any time. Unless the Client provides written notice to the contrary, the Investment Manager shall use its best efforts to liquidate the assets held in the Separate Account in the manner described in Section 11(a) above. The Investment Manager may also terminate this Agreement at any time upon ten (10) days prior written notice

(c)    to the Client if the Client materially breaches any of its representations, warranties or covenants set forth herein.

(d)    The Client or the Investment Manager may terminate this Agreement upon ten (10) days' prior written notice if the Client delivers any amendment to the Investment Guidelines or any Additional Instructions to the Investment Manager pursuant to Section 2(a) and such amendment or Additional Instructions are objected to by the Investment Manager and that objection cannot be resolved to the satisfaction of the Client and the Investment Manager after negotiating in good faith for five (5) business days. Unless the Client provides written notice to the contrary, the Investment Manager shall use its best efforts to liquidate the assets held in the Separate Account in the manner described in Section 11(a) above.

12.    Management Fee

(a)    For the services rendered hereunder, the Client shall pay the Investment Manager a monthly management fee (the "**Management Fee**") equal to (i) one-twelfth of the Designated Management Percentage (as defined in Section 12(e) below) multiplied by the Net Asset Value of the Separate Account (including any gains or losses thereon) as of the first day of the applicable month, in each case calculated after the Initial Contribution and any Additional Contribution, as applicable, made to the Separate Account as of the first day of the applicable month. The Management Fee shall be payable monthly in advance (other than as described below) and will be debited directly from the clients Separate Account.

(b)    If the Client contributes assets to the Separate Account, including the Initial Contribution, on a date other than the first day of a month, the Separate Account shall be charged a prorated portion of the Management Fee for that month with respect to such contribution, based on the number of days remaining in that month (relative to the total number of days in the month) and the amount of the relevant contribution. The amount of such prorated portion of the Management Fee shall be invoiced together with the amount of the Management Fee payable in respect of the calendar month following the mid-month contribution.

(c)    If the Client withdraws all or a portion of the assets from the Separate Account, whether on termination of this Agreement or otherwise, on any date other than the last day of a month, the Investment Manager shall rebate to the Client, within fifteen (15) calendar days of such withdrawal or termination, a *pro rata* portion of the Management Fee paid to the Investment Manager for such month based on the number of days remaining in the month (relative to the total number of days in the month) and the Net Asset Value of the assets withdrawn in that month (relative to the total Net Asset Value of the Separate Account as of the first day of the month).

(d)    The "**Net Asset Value**" with respect to the Separate Account or any other pool of assets, means the value of such assets, including realized and unrealized appreciation and depreciation of its securities, *less* the liabilities attributable thereto at such time, each as calculated by the Custodian Interactive Brokers LLC in accordance with U.S. generally accepted accounting principles.

9

(e)    The "Designated Management Percentage" with respect to the Initial Contribution and any Additional Contribution, means two percent (2.00%).

13.    Performance Fee

(a)    The Investment Manager shall be paid a performance fee (the "Performance Fee") as of the end of each calendar month (and upon withdrawal from the Separate Account in the event of an intra-month withdrawal) equal to the Designated Performance Percentage (as defined in Section 13(f) below) multiplied by the New Net Profits (as defined in Section 13(e) below) with respect to the Separate Account (or with respect to the amount withdrawn, as applicable); *provided* that to the extent that the Net Asset Value of the Separate Account has decreased during a relevant period, other than as a result of withdrawals from the Separate Account (such decrease in value, the "Net Losses"), then any future New Net Profits with respect to the Separate Account shall be applied first toward the Net Losses of the Separate Account and no Performance Fee shall be paid to the Investment Manager for any subsequent period until the aggregate amount of Net Losses has been recouped. As a result, a "high water mark" convention applies to the Separate Account. In the event capital is withdrawn from the Separate Account at a time when there are unrecovered Net Losses from a prior year, the amount of the Net Losses outstanding immediately following such withdrawal shall be deemed reduced based on the amount of the withdrawal (relative to the total Net Asset Value of the Separate Account immediately prior to such withdrawal). During the term of the Agreement and the two-year period following the termination of this Agreement, the Client agrees to permit the Investment Manager to inspect the Client's records relating to the calculation of the Net Asset Value and New Net Profits of the Separate Account at the Client's office during normal business hours upon the Investment Manager providing reasonable prior notice to the Client.

(b)    The Performance Fee shall be paid by debit directly from the client's Separate Account.

(c)    Computations of the Performance Fee and the New Net Profits shall be adjusted to take into account any Additional Contributions, or withdrawals from the Separate Account. If the Client makes one or more Additional Contributions, the Performance Fee and all related computations of New Net Profits and Net Losses shall be determined separately in respect of the Initial Contribution and each such Additional Contribution (i.e., as if each such capital contribution comprised a distinct Separate Account).

(d)    In the event of a withdrawal at any time other than year-end, the Performance Fee will be calculated as of the date of the withdrawal solely with respect to the amount withdrawn. In the event that this Agreement is terminated, the Performance Fee shall be computed as of the date the Separate Account is liquidated in accordance with Section 11(a) hereof.

(e)    "New Net Profits" means any increase in the Net Asset Value of the Separate Account (or portion thereof withdrawn) from the beginning to the end of the relevant period, adjusted for additions and withdrawals to the Separate Account and after reduction for the expenses set forth in Section 14(b) herein and the Management Fee.

10

(f)    The "Designated Performance Percentage" with respect to the Initial Contribution and any Additional Contribution means **twenty percent (20%)**.

14.    Expenses

(a)    The Investment Manager shall be responsible for all internal operating expenses and overhead of the Investment Manager, including, without limitation, the rent, salaries of its employees, utilities, and any travel and related expenses incurred in connection with its performance of services under this Agreement.

(b)    The Client shall be responsible for all third party custodial fees, brokerage commissions, clearing fees, investment expenses, audit expenses, administrative expenses, disbursements and interest and withholding or transfer taxes incurred in connection with trading for the Separate Account.

15.    Confidentiality

(a)    The Investment Manager, on the one hand, and the Client, on the other hand, each acknowledges that, during the term of this Agreement, each party shall have access to confidential and proprietary information of the other party, including information regarding investment and trading strategies of the Separate Account, investments made and positions held by clients and funds, the terms of this Agreement and any information relating to the assets in the Separate Account furnished to the Client and/or the Investment Manager by any brokers or custodians.    Except as required by law or requested by a regulatory authority, each of the Investment Manager and the Client agrees that it shall not, and shall cause its affiliates, directors, officers, employees and agents not to sell or otherwise disclose any such confidential information to any unaffiliated third party other than the Custodian, the Administrator, auditors and other authorized agents of the Client (which shall include, without limitation, the Client's advisors, accountants and other professionals) or the Investment Manager or their affiliates, in each case who are obligated to keep such information confidential.    For the avoidance of doubt, (i) this Agreement, the provisions hereof, and the Client's status as a client of the Investment Manager shall be deemed confidential information, and (ii) the Client may provide confidential information to its affiliates and each of their respective officers, directors, trustees, employees, equity holders, agents and service providers, provided that each such party agrees to keep such information confidential.    In addition, the Client agrees not to, and agrees to cause its affiliates not to, use any such confidential information for any purpose other than evaluating or monitoring the Separate Account, and further agrees not to use any such confidential information to knowingly replicate the Investment Manager's investment strategy.    Notwithstanding the foregoing, the Investment Manager hereby consents to the use by the Client or its affiliates of the Investment Manager's name and disclosure of the assets under management in the Separate Account, in each case, in quarterly or other periodic reports which may be distributed externally.

11

(b)      Notwithstanding the foregoing, Section 15(a) does not apply to any information that: (i) is or becomes a matter of general public knowledge without any violation of this Agreement; (ii) was available to the Investment Manager or the Client or any of its affiliates, officers, directors, employees or representatives on a non-confidential basis, without any wrongdoing on the part of such party, prior to the disclosure of such information by such party; or (iii) comes into the Client or Investment Manager's possession from any party not affiliated with the Client or Investment Manager properly in possession of such information and the receiving party is not aware that such source is bound to keep such information confidential. The provisions of Section 15(a) and (b) shall survive termination of this Agreement.

16.    <u>Governing Law Disputes</u>

To the extent Federal law does not apply to this Agreement, it shall be construed in accordance with the laws of the State of New York.

17.    <u>Indemnification</u>

(a)      The Investment Manager hereby agrees to and shall defend, indemnify and hold the Client and its affiliates, and their respective employees (present and former), officers, agents, trustees and directors (collectively, "Client Indemnified Persons"), harmless from and against any and all third party claims, demands and actions, and any and all damages, expenses (including reasonable attorney fees), losses and costs (collectively, "Losses") related thereto, sustained by a Client Indemnified Person arising from or related to the Investment Manager's gross negligence, willful misconduct, fraud, material breach of this Agreement or violation of applicable law in connection with the above stated responsibilities, representations and warranties of the Investment Manager.   The indemnity set forth in this Section 17(a) shall survive the termination of this Agreement.

(b)      The Client hereby agrees to and shall defend, indemnify and hold the Investment Manager and its principals, members, officers, employees and affiliates, and such affiliates' respective employees (present and former), managers, principals, members, officers, employees and agents (collectively, "Investment Manager Indemnified Persons"), harmless from and against any and all third party claims, demands and actions, and any and all Losses related thereto, sustained by an Investment Manager Indemnified Person arising from or relating to the Investment Manager's performance of its duties under this Agreement, *provided that* the applicable claim, demand, action, or Loss does not arise from any act or omission of an Investment Manager Indemnified Person constituting gross negligence, willful misconduct, fraud, a material breach of this Agreement or a violation of applicable law.  The indemnity set forth in this Section 16(b) shall survive the termination of this Agreement.

18.    <u>Acknowledgement of Receipt of Disclosure Documents</u>

The Client acknowledges receipt of the Investment Manager's Form ADV Parts 2A and 2B (the Brochure and Brochure Supplement), and its Privacy Policy.

19.    Miscellaneous

(a)    *Cooperation with the Auditors and Tax Advisors*. In connection with the audit of the Client or its partners and the preparation of any tax returns or filings, including but not limited to, financial and regulatory audits, the Investment Manager shall (i) provide to the auditors, tax advisors or the Client, as the case may be, such information and documentation as may be reasonably requested, (ii) permit the auditors to review the relevant records and procedures of the Investment Manager, and (iii) otherwise cooperate with the auditors, the tax advisors or the Client as necessary in connection with such audit or the preparation of such tax returns or filings. This cooperation may include signing management representation letters as required by the auditors and the Client.

(b)    *Authorization*. The Client shall furnish to the Investment Manager from time to time and upon request of the Investment Manager copies of the names, titles, and authorities of its officers, employees and agents who are authorized to act on behalf of the Client with respect to the Separate Account. The Investment Manager shall furnish to the Client and the Custodian from time to time and upon request by the Client or the Custodian the names and authorized signatures of the persons authorized to act on the Investment Manager's behalf.

(c)    *Notice*. Any notice, request, instruction, or other advice for documents required hereunder shall be given or confirmed in writing and shall be deemed to have been given to or received by the appropriate party as of the date on which it is personally delivered or, if mailed, on the third (3rd) business day after the date on which it is deposited in the United States mail, postage prepaid, or, if emailed, upon transmission of the email, if mailed, emailed, or delivered to the attention of the person at the address set forth below:

(i)    If to the Client to:
Deborah Waldemar
1401 Gulf Blvd, Apt 110
Clearwater, FL 33767

(ii)    If to the Investment Manager to:

Golden Wealth Management, Inc.
496 Wainscott Harbor Road
PO Box 1295
Sagaponack, NY 11962
631.208.0300

13

or to such other persons and at such places as a party from time to time may notify to the other party.

(d)   *Assignment*.  This Agreement may not be assigned by either party without the prior written consent of the other party, except that the Client may assign this Agreement to any of its affiliates with the same beneficial owners as the Client that make the same representations in Section 9(b) herein.

(e)   *Entire Agreement*.  This Agreement and the related Schedules, Attachments and Exhibits, embody the entire understanding of the parties; supersede any prior agreements or understandings with respect to the subject matter hereof; and, except as otherwise set forth herein, cannot be altered, amended, supplemented or abridged or any provisions waived except by written agreement of the parties.

(f)   *Remedies Cumulative*.  The remedies under this Agreement are cumulative and shall not exclude any other remedies to which any person may be lawfully entitled.

(g)   *Independent Contractor*.  The Investment Manager is and shall hereafter act as an independent contractor and not as an employee of the Client, and nothing in this Agreement may be interpreted or construed to create any employment, partnership, joint venture or other relationship between the Investment Manager and the Client.

(h)   *Severability*.  Any term or provision of this Agreement which is found to be prohibited or unenforceable shall be construed to the maximum extent permitted by law, so as not to invalidate the remainder of this Agreement, which shall continue in full force and effect unaffected by such prohibition or unenforceability.

(i)   *Additional Documents and Acts*.  Each party agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuate, carry out and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated hereby

(j)   *No Third-Party Beneficiaries*.  Neither party intends for this Agreement to benefit any third party not expressly named in this Agreement.

(k)   *No Waiver of Rights*.  Notwithstanding anything in this Agreement to the contrary, no provision of this Agreement shall be construed as a waiver of rights that the Client and/or the Investment Manager have under applicable state and federal securities laws.

(l)   *Counterparts*.  This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, but which together shall constitute one and the same instrument.  In order to expedite the execution of this Agreement, a facsimile or pdf. signature shall be binding upon the parties and shall have the same force and effect as the original signature.

*[Signature Page to Follow]*

14

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

"CLIENT"

By: *Deborah Waldemar*

Name: Deborah Waldemar

By: _____

Name:

"INVESTMENT MANAGER"

Golden Wealth Management, Inc.

By: _____

Name:       Shaun P. Golden

Title:       President

15

## SCHEDULE A

## INVESTMENT GUIDELINES AND OBJECTIVES

**Investment Objective**
> Achieve capital appreciation.

**Strategy**
> Golden Wealth Management, Inc. invests in the overlap between value and mathematically driven models to help avoid value traps of pure value investing, while also providing fundamental analysis.

**Strategy Workflow**
> Employ algorithms to ascertain the shareholder strength of every security in our universe.
> Evaluate those securities through investigative reporting to confirm that they are fundamentally very cheap or very expensive based on current and future cash flows.
Long and short criteria
> Implement risk management considerations.
Worry about risk even though it costs returns, override the algorithm
> Exploit mis-pricings identified through the algorithm caused by fundamental changes to trade with shareholder sentiment and value.
> Exploit those mis-pricings before the price has fully corrected.
> Rebalance.

**Portfolio Construction Requirements and Limitations**
> Permitted Investments: Solely publicly-traded, exchange-listed, equity securities & ETF's
> Minimum Market Capitalizations: >$200MM
> Net Exposure: Between -30% and +30%
> Number of Long Positions: 25-50
> Number of Short Positions: 5-25
> Long Exposure: 80-90%
> Short Exposure: 80-90%
> Average Position Size: 2-4%
> Maximum Position Size: 5%
> Account will be managed to full liquidity within 10 days with minimal market impact

16

IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
IN AND FOR PINELLAS COUNTY, STATE OF FLORIDA
CIVIL DIVISION

**Deborah Waldemar,** individually and as owner
of her IRA,

|  |  |
|---|---|
| **Plaintiff,** | Case No. 17-005571-CI |

v.

**Shaun P. Golden,** individually, and
**Golden Wealth Management, Inc.,** a
New York corporation,

**Defendants**.

_____/

**PLAINTIFF'S NOTICE OF SERVICE**
**OF FIRST SET OF INTERROGATORIES UPON DEFENDANT**

Plaintiff, through the undersigned counsel, hereby gives notice of service of the First Set

of Interrogatories upon Defendant Shaun P. Golden, the answers to which are due forty-five (45)

days from the date of service pursuant to Florida Rule of Civil Procedure 1.340.

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing Plaintiff's Notice of
Service of Interrogatories has been served by process server with the Complaint filed in this case
on Golden Wealth Management, Inc. and Shaun P. Golden at 496 Wainscott Harvor Rd.,
Sagaponack, New York 11962 and at c/o Drew Breakspear, Commissioner of the Office of
Financial Regulation, 101 E. Gaines S., Tallahassee, FL 32399.

Jeffrey P. Coleman, Esquire
FBN.: 503614
Primary: jeff@colemanlaw.com
Secondary: emily@colemanlaw.com;
livia@colemanlaw.com
**COLEMAN LAW FIRM**
581 S. Duncan Avenue
Clearwater, FL 33756
Telephone: (727) 461-7474
Facsimile: (727) 461-7476
Attorney for Plaintiffs